IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| BERTHA M. WASHINGTON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JO ANNE B. BARNHART, Commissioner )<br>of Social Security, )<br>)<br>Defendant. ) | CIVIL ACTION NO. 3:04CV913-SRW<br>(WO) |

**MEMORANDUM OF OPINION**

Plaintiff Bertha M. Washington brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

In January 2001, plaintiff was working part-time for the Jet Center, cooking and cleaning for senior citizens, when she was diagnosed with ductal carcinoma of the right breast, which was thereafter successfully treated and has not recurred. Plaintiff had a lumpectomy and axillary sampling on January 25, 2001. She was treated with a course of chemotherapy between February and early June 2001. In early July, after the chemotherapy, plaintiff reported to her physician that she was "feeling well and continuing her usual

moderate activity level," and that she continued to work part-time. She received radiation treatment to the right breast from Dr. Wes Glisson between July 11, 2001 and August 29, 2001. (R. 87, 92,-93, 98, 154-55, 257-58). In late July and early August, plaintiff reported that she was "feeling well" and "maintaining her active lifestyle." In the last few weeks of August, plaintiff reported pain resulting from a skin reaction to the radiation treatment and her physician prescribed pain medication. (R. 89-90). In follow-up appointments on December 5, 2001 and June 5, 2002, plaintiff was reported to be "doing well today and without complaints." (R. 88).

> On July 10, 2002, plaintiff returned to Dr. Glisson. His treatment note states:
>
> She asked to been seen today as she has some concerns about her right arm and also is inquiring about disability. The patient was working as a nursing care assistant for elderly patients prior to her surgery, but states she has not been able to work since. She is noting some mild discomfort and sensory changes of the right hand. She is otherwise doing well and not[sic] changes in her weight. KPS is 80. Physical exam shows no palpable lymph nodes or breast masses. The right breast has mild residual radiation skin changes and firmness. The right arm has very slight swelling comparted to the left and no evidence of infection. She does not have any gross neurologic deficients of the right arm. Recent mammography is okay. I have not advised further evaluation or changes in her supportive care. She will take non-prescription pain medicine as needed. I am not sure how to advise her on disability, but she plans to initiate the evaluation process for this. She was asked to return in December and planning bilateral mammography at that time. She was asked to contact me sooner if she was having progressive problems with the right arm. I will try and get her to obtain an arm sleeve if desired.

(R. 88). On the same day, plaintiff filed the present application for disability insurance benefits, alleging that she became disabled one week earlier, on July 2, 2002. (R. 42-44).

On September 25, 2002, plaintiff reported to Dr. Edith Graves that she had "some

stiffness and swelling in her right arm." Dr. Graves noted some "mild lymphedema" of the right upper extremity, and also noted that plaintiff had full range of motion of the right upper extremity. (R. 168). A whole body bone scan and a Doppler ultrasound of the venous system of plaintiff's right upper extremity on October 4, 2002 were both unremarkable. (R. 157-58). In April 2003, plaintiff reported "occasional discomfort" in her right shoulder joint; Dr. Graves diagnosed "[p]robable arthritis right shoulder" and recommended that plaintiff try Aleve or Advil. (R. 168).

On July 24, 2003, plaintiff sought treatment from Dr. David Scott at The Orthopaedic Clinic, complaining of right arm pain, localized in her right shoulder. Dr. Scott's examination revealed a "mildly positive impingement test," and he diagnosed rotator cuff tendinitis. He prescribed anti-inflammatory medication and rotator cuff exercises. On August 12, 2003, plaintiff continued to report right shoulder pain. Dr. Scott recommended an injection, which plaintiff refused. Dr. Scott stated, "Treatment alternatives are discussed with her, none of which she prefers, including therapy or injections. Would like a stronger anti-inflammatory. She is told we do not have a stronger one to offer her. We will see her back as needed." (R. 221).

On September 4, 2003, plaintiff went to see Dr. Kishore Chivukula of East Alabama Neurology complaining of "pain and difficulty in moving the arm ball after surgery." She further reported that she could not sleep at night, and had lightheadness, dizziness, headaches, and nausea. (R. 250). On September 10, 2003, Dr. Chivukula performed a nerve conduction study and EMG. On September 16, 2003, he interpreted the test results,

diagnosing "[s]evere right and moderately severe left carpal tunnel syndrome, distal ulnar neuropathy on right." (R. 242). Dr. Chivakula suggested that plaintiff might try surgery, but plaintiff was not willing to do so. (R. 237). He prescribed carpal tunnel braces for both hands and gave plaintiff samples of Keppra, 250 mg. (R. 239). Although Dr. Chivukula also noted "[p]ossible remote right C7-C8 radiculopathy without evidence for ongoing denervation" (id.), a CT scan he ordered of plaintiff's cervical spine on September 22, 2003 was "normal." (R. 211, 236-38). On September 25, 2003, plaintiff reported that her arm pain was "better." Dr. Chivakula continued plaintiff on the Keppra. (R. 234-35).

In her treatment notes for plaintiff's six-month follow-up examination at Internal Medicine Associates on October 7, 2003, Dr. Linda Farmer[1] noted, "Her main complaint today is her chronic discomfort in her right shoulder. She is also starting to have some right knee pain, which is new. Otherwise, she has no significant complaints." (R. 166). Dr. Farmer observed that plaintiff was "morbidly obese," and that she had "mild lymphedema of the right upper arm." (Id.).

The following day, plaintiff went to see Dr. Susan Jones. Plaintiff complained of right arm pain and also stated that "her right knee is bothering her and has been doing so for a couple of weeks." She indicated that both the right shoulder pain and the knee pain "come and go." (R. 165). On examination, Dr. Jones reported:

> Her right knee is without swelling and without crepitus. She has full range of motion. There is no laxity of the joint. Her strength is appropriate. Her right shoulder is again with full range of motion. She does not have any overt

---

[1] Records from Internal Medicine Associates (Exhibit 6F) include treatment notes from Dr. Edith Graves, Dr. Allen Graves, Dr. Linda Farmer and Dr. Susan Jones.

4

swelling in that arm. Her hand grips are equal bilaterally.

(Id.). Dr. Jones ordered x-rays, indicating, "I think this [right shoulder and right knee pain] is more of an arthritic type pain," and started plaintiff on Celebrex. (Id.). The x-rays were within normal limits. (R. 164, 212). On October 31, 2003, plaintiff reported that the Celebrex "helps some," but had not made the pain go away completely. Dr. Jones increased plaintiff's Celebrex. (R. 164).

On December 24, 2003, plaintiff reported to the emergency room complaining of right knee pain. (R. 217). An x-ray was "unremarkable," showing no evidence of joint effusion, fracture or dislocation and well-maintained joint spaces. (R. 210). On January 2, 2004, plaintiff returned to Dr. Jones. Plaintiff reported that the Celebrex had not helped her pain much, nor had the Naprosyn prescribed by the ER physician, and that the bottom of her foot "sometimes feels numb." On physical examination, plaintiff's knee was "without effusion" and had full range of motion and no crepitus. Dr. Jones prescribed pain medication and referred plaintiff back to The Orthopaedic Clinic. (R. 164).

On January 8, 2004, Dr. Thomas of The Orthopaedic Clinic examined plaintiff. He reported a "large effusion" and "pain and crepitus on ROM." X-rays showed "minimal arthritic change." He aspirated fluid from plaintiff's knee and gave her an injection. In a follow-up examination one week later, he noted no effusion, good range of motion and minimal tenderness. Plaintiff reported that her knee was feeling "a little better," but that she still had pain "running up and down the leg" and numbness on her heel. Dr. Thomas' assessment was:

5

> Probable degenerative arthritis of the right knee. No real evidence of gout. She may have some lumbosacral arthritis which is giving her some radicular symptoms and some mild heel pain.

He suggested weight reduction and exercises, and continued plaintiff on her medications. (R. 219).

On March 25, 2004, after plaintiff's claim for disability benefits was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on May 28, 2004. The ALJ concluded that plaintiff suffered from the severe impairments of "right breast cancer status post lumpectomy, bilateral carpal tunnel syndrome, and degenerative arthritis of the right knee." (R. 18). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff had not been disabled within the meaning of the Social Security Act since the alleged onset date. On July 28, 2004, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v.

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ applied the Eleventh Circuit pain standard improperly and (2) the hypothetical question posed by the ALJ to the vocational expert was inadequate.

### Plaintiff's Subjective Complaints

At the administrative hearing, plaintiff testified as follows:

Her right arm hurts from her shoulder blade to her hand, and both of her hands hurt and are "kind of numb." (R. 261, 264). She has a license, but cannot drive a car and is not able to do much around the house. She constantly has a "catch" in her right shoulder and can hardly move her right arm. (R. 265, 269). After riding a "long way" in the car, both of her legs are stiff. Her medication "helps some" but when it wears off, the pain returns. She has problems grasping things because of the numbness in both of her hands. The most she

could hold is a cup, but she "couldn't say [she] could hold it good." (R. 267). The most she can lift in her hand is "[m]aybe a couple of files." Her husband, son, daughter, niece and nephew help her with cooking and washing dishes. She is able to make a fist "sometime[s]." (R. 268). She does not do household chores much. She takes Keppra, which sometimes makes her drowsy. (R. 269-70).[2] During the day, she "tr[ies] to walk around a little bit." She then watches television for a couple of hours. She has pain in her knees. She does not take naps during the day or cook dinner. (R. 270). She does not go out or do errands during the day unless somebody comes to take her. She does not think she could do a job filing, handling papers or answering the phones, because it hurts her hands. When her hands get numb, she can't hold anything. (R. 271). The bottom of her right foot is numb every day. Her left foot gets numb "a little bit," but doesn't "feel as bad as the right foot." (R. 273). The biggest obstacle to returning to work is her hands and her right knee. (R. 272). At the time of the hearing, plaintiff was taking Keppra, Celebrex, and Ibuprofen regularly, and Dr. Thomas had also started her on Piroxicam pills the day before the hearing. (R. 218, 266,

---

[2] Plaintiff testified as follows:

Q. Let me ask you about your medications. What did you say you were taking?

A. I was taking, from Dr. [Chivakula] I'm taking that – I had it rolling around, Keppra.

Q. Okay. Do you get any side effects from your medicine?

A. No, not so far.

Q. Okay. Does it make you drowsy or anything?

A. Yeah, sometime.

(R. 269-70).

272).

In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). "The standard also applies to complaints of subjective conditions other than pain." Holt, *supra*, 921 F.2d at 1223. If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms. Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992). After considering the testimony, the ALJ may reject the claimant's subjective complaints. However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony. Id. The reasons articulated by the ALJ must be "explicit, adequate, and supported by substantial evidence in the record." Preston v. Barnhart, 2006 WL 1785312, *1 (11th Cir. Jun. 29, 2006)(unpublished opinion)(citing Hale v. Bowen, 831 F.2d 1007, 1011-12 (11th Cir. 1987)). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).[3] "The credibility determination does

---

[3] See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's

not need to cite "'"particular phrases or formulations'" but it cannot merely be a broad rejection which is "'not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole."'" Dyer, *supra*, 395 F.3d at 1210 (citations omitted).

In his decision, the ALJ articulated a number of reasons for discounting plaintiff's testimony of disabling pain and functional restrictions. (R. 15-16). The plaintiff argues that the ALJ's credibility determination was flawed because: (1) he failed to develop the evidence regarding plaintiff's reported medication side effect of sleepiness; (2) he failed to consider plaintiff's diagnosed morbid obesity in assessing the degree of her pain; (3) he looked for specific medical findings confirming the severity of plaintiff's complaints of pain and ignored the objective medical testing demonstrating severe right carpal tunnel syndrome and moderately severe left carpal tunnel syndrome; (4) he based his decision on the opinion and medical source statement of the consultative examiner, Dr. Walkup, who rendered his opinion when he did not have a copy of the medical records from Dr. Chivakula; (5) he failed to credit the statement in Dr. Walkup's report that plaintiff has "numbness in her extremities;" (6) his determination that plaintiff's bilateral carpal tunnel syndrome "appears

---

statements. The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

10

to be reasonably managed through her current treatment regimen with bilateral wrist splints and Keppra" is not supported by substantial evidence; (7) the ALJ did not develop the record on the issue of whether surgery for CTS would have been successful and, thus, cannot rely on the fact that plaintiff declined such surgery; (8) the ALJ did not state why he found the opinion of Dr. Walkup, an examining pulmonary physician, to be more persuasive than that of plaintiff's treating neurologist regarding plaintiff's functional limitations.

Plaintiff's arguments are without merit. The ALJ acknowledged plaintiff's testimony regarding Keppra sometimes making her drowsy (R. 16; see also n. 2, *supra*) but stated, correctly, that there is "no indication she has reported this as a significant problem to any treating medical sources." (R. 16). Dr. Chivakula started plaintiff on Keppra on September 16, 2003. In subsequent office visits with Dr. Chivakula on September 25, 2003 and October 23, 2003 and with Dr. Jones on October 31, 2003 and January 2, 2004, the treatment notes reflect that plaintiff is taking Keppra, but include no indication that plaintiff reported any problems with drowsiness or other side effects from the medication. (R. 164, 232-37). See Turner v. Commissioner of Social Security, 2006 WL 1490144, *2 (11th Cir. May 31, 2006)("The ALJ did not err in discrediting Turner's testimony regarding side-effects from her medications because the record includes no evidence that Turner consistently complained to her doctors of any side-effects.")

Plaintiff, who is 5'1" tall, weighed between 208 pounds and 232 pounds during the period of time reflected in the medical records. The ALJ noted Dr. Thomas' recommendation that plaintiff reduce her weight. (R. 13-14; 219). The ALJ's failure to

11

mention plaintiff's diagnosis of "morbid obesity" (Dr. Farmer, October 7, 2003, R. 166) in his decision does not mean that he failed to consider plaintiff's weight. See Dyer, *supra*, 395 F.3d at 1211 ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the district court or the Eleventh Circuit] to conclude that [the ALJ] considered her medical condition as a whole.'").[4]

Plaintiff argues that the ALJ credited the opinion of Dr. Walkup regarding plaintiff's functional limitations over the opinion of her treating physician, Dr. Chivakula, that the ALJ ignored the objective evidence of plaintiff's severe right and moderately severe left carpal tunnel syndrome with distal ulnar neuropathy on the right, and that Dr. Walkup's assessment is flawed because he did not have a copy of Dr. Chivakula's records. Contrary to plaintiff's argument, it is apparent that the ALJ considered and fully credited Dr. Chivakula's diagnosis of carpal tunnel syndrome. He discussed the diagnosis and found that plaintiff suffered from the severe impairment of bilateral carpal tunnel syndrome (R. 14, 15, 18). Additionally, Dr. Chivakula rendered no opinion regarding plaintiff's resulting functional limitations (see Exhibit 8F). Thus, there was no treating physician opinion for the ALJ to weigh against the functional limitations set forth in the medical source opinion provided by the consultative examiner. Although Dr. Walkup did not have a copy of Dr. Chivakula's medical records,

---

[4] Additionally, the ALJ adopted the findings of the consultative examiner, Dr. Walkup, regarding plaintiff's functional limitations. Dr. Walkup recorded plaintiff's height as 60 inches and her weight as 232 on the day of the examination. (R. 113). Dr. Walkup was clearly aware of plaintiff's obesity when he assessed her functional limitations. See SSR 02-01p ("Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.").

12

he was aware that plaintiff was being treated by Dr. Chivakula for diagnosed bilateral carpal tunnel syndrome, that plaintiff had been wearing bilateral wrist splints for a month, and that Dr. Chivakula had prescribed Keppra 500 mg, one half of a pill two times per day. (R. 111). Dr. Walkup assessed plaintiff as having bilateral carpal tunnel syndrome and included functional limitations consistent with this diagnosis. (R. 115-17). The ALJ, who did have a copy of Dr. Chivakula's records, found that Dr. Walkup's opinion was "generally consistent with the record as a whole." (R. 15). The ALJ did not err in crediting Dr. Walkup's assessment.

Plaintiff also contends that the ALJ erred by looking for specific medical findings in order to credit the plaintiff's complaints of pain. An ALJ may not reject a plaintiff's statements about the intensity and persistence of pain or other symptoms solely because the objective medical evidence does not confirm the statements. 20 C.F.R. § 404.1529(b). In the present case, the ALJ cited the lack of objective physical findings indicative of pain, but also articulated a number of additional reasons for discrediting plaintiff's testimony. (See R. 16).

Plaintiff contends that the ALJ ignored the statement in Dr. Walkup's report that plaintiff has "numbness in her extremities off and on" and that this statement "confirms [plaintiff's] testimony on her difficulty holding objects in her hands." (Plaintiff's brief, p. 8). However, the referenced statement in Dr. Walkup's report was not a clinical finding, but was reported by plaintiff to Dr. Walkup. (R. 112). Thus, plaintiff argues that her statement to the consultative examiner confirms her testimony before the ALJ. Dr. Walkup conducted

a physical examination and also assessed functional limitations on the basis of plaintiff's subjective complaints. (R. 117). The assessment, which was adopted by the ALJ, includes a limitation to only occasional handling and fingering. (R. 116). Although the ALJ did not find plaintiff to be as impaired as she claimed at the hearing, he clearly did not ignore plaintiff's report of "numbness in her extremities off and on" in assessing her residual functional capacity.

The plaintiff argues that the ALJ's conclusion that the plaintiff's bilateral CTS "appears to be reasonably managed through her current treatment regimen with bilateral wrist splints and Keppra" is not supported by substantial evidence. She further contends that his observation that plaintiff "has rejected her neurologist's recommendation to try carpal tunnel surgery" is flawed because the ALJ did not develop the record on this issue and there is no evidence that the surgery would have been successful. (Plaintiff's brief, pp. 8-9). However, there is evidence that, in office visits after Dr. Chivakula started plaintiff on Keppra and prescribed wrist splints, plaintiff reported that her arm pain was "better." (R. 235, 229). Further, the plaintiff's failure to seek carpal tunnel surgery when Dr. Chivakula has proposed it as an alternative (R. 237) is additional evidence that plaintiff's condition is reasonably managed through the less aggressive treatment. See 20 C.F.R. § 404.1529(c)(3)(treatments and methods used to relieve pain are an important indicator of its intensity and persistence).[5]

---

[5] The ALJ did not, as plaintiff's argument implies, deny benefits because of the plaintiff's failure to follow prescribed treatment which would restore her ability to work. See 20 C.F.R. 404.1530. Rather, the ALJ concluded that plaintiff presently retains the ability to work and that her failure to follow the recommendation for surgery is evidence that her condition is reasonably managed by her current treatment regimen.

The ALJ articulated adequate reasons, supported by substantial evidence, for his credibility determination. Thus, he complied with the requirements of the Eleventh Circuit pain standard.

Hypothetical Question to the Vocational Expert

Plaintiff argues that the ALJ erred by failing to include plaintiff's "self-described functional limitations, pain, numbness in her extremities, and sleepiness due to her medication, in any of his hypothetical questions to the VE." (Plaintiff's brief, p. 12). Plaintiff further argues that the ALJ's hypothetical question "assumed that Ms. Washington could perform less than a full range of sedentary work without any consideration of her non-exertional impairments." (Id.). However, the court has concluded that the ALJ properly applied the Eleventh Circuit pain standard in discrediting plaintiff's complaints of subjective symptoms. The ALJ was not required to include plaintiff's "self-described functional limitations, pain, numbness in her extremities, and sleepiness due to her medication" in the hypothetical question, except to the extent that he found them credible. See Turner, *supra*, 2006 WL 1490144 at *3 ("The hypotheticals did not need to include Turner's subjective testimony of pain and side-effects from her medications because, as explained above, substantial evidence supports the ALJ's discrediting this testimony."). The residual functional capacity determined by the ALJ includes a number of non-exertional limitations including, as noted previously, a limitation to occasional handling and fingering. (See R. 18 (Finding No. 6); R. 115-17).[6] The ALJ's finding as to plaintiff's residual functional capacity

---

[6] The terms exertional and nonexertional describe types of functional limitations or restrictions resulting from a medically determinable physical

is supported by substantial evidence, and his hypothetical question to the vocational expert incorporated the finding.  The ALJ did not err by failing to include additional limitations in the hypothetical question.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be affirmed.  A separate judgment will be entered.

Done, this 11th day of August, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

---

or mental impairment. See Social Security Ruling 96-4, 61 Fed. Reg. 34488 (July 2, 1996).  Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling. Id.  Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands. Id.

Phillips v. Barnhart, 357 F.3d 1232, 1242 n. 11 (11th Cir. 2004).